**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

No. 7:08-CV-128-FL

| | | |
|---|---|---|
| ROBERT L. HOFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on the parties' cross Motions for Judgment on the Pleadings **[DE'S 17-18 and 21-22]**. The time for the parties to file any responses or replies has expired. Accordingly, this matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636 (b)(1), this matter is before the undersigned for the entry of a Memorandum and Recommendation. For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Judgment on the Pleadings **[DE-17]** be **DENIED**, Defendant's Motion for Judgment on the Pleadings **[DE-21]** be **GRANTED**, and the final decision of the Defendant be **AFFIRMED**.

**Statement of the Case**

Plaintiff applied for disability insurance benefits (DIB)[1] on May 17, 2005, alleging that he has been disabled since May 1, 2002 (Tr. 14). This application was denied initially and on reconsideration (Tr. 14). A hearing was held before an Administrative Law Judge ("ALJ"), who

---

[1]Plaintiff previously filed an application for disability insurance benefits and supplemental security insurance on October 23, 2002, alleging disability beginning on May 8, 2002 (Tr. 14). An Administrative Law Judge denied this claim on February 15, 2005 (Tr. 14). The Social Security Administration's Office of Hearing and Appeals denied Plaintiff's request for review on May 3, 2005 (Tr. 14).

found Plaintiff was not disabled during the relevant time period in a decision dated February 19, 2008 (Tr. 14-27). The Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review on June 21, 2008, rendering the ALJ's determination as Defendant's final decision (Tr. 6-9). Plaintiff filed the instant action on August 12, 2008. **[DE-1]**.

## **Standard of Review**

The Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. § 405 (g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .

> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is

"supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## Analysis

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment (Tr. 16). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) fibromyalgia; 2) osteoarthritis; 3) gastroesophageal reflux disease (GERD); 4) hypertension; and 5) cervical and lumbar spondylosis (Tr. 16). Plaintiff also alleged disability due to depression (Tr. 17). The ALJ considered four broad functional areas in evaluating Plaintiff's depression (Tr. 17). These areas included Plaintiff's activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation (Tr. 17-18). The ALJ found that:

Based on the medical evidence . . . [Plaintiff's] depression or any anxiety symptoms do not significantly impact his ability to perform basic work-related activities and does not represent a severe impairment (Tr. 18).

In completing step three, however, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, subpart P, App. I (Tr. 19). Based upon these findings, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform:

[A] wide range of light work; lifting and carrying, pushing and pulling 20 pounds occasionally and 10 pounds frequently; sitting with alternating position at will up to six hours in an eight-hour workday; standing and walking six hours in an eight-hour workday, and occasional stooping, crouching, kneeling, and crawling. The [Plaintiff] has no manipulative, visual, communicative, or environmental restrictions.
(Tr. 19).

In making this finding, the ALJ considered all of the Plaintiff's impairments, including Plaintiff's non-severe depression (Tr. 19). The ALJ then proceeded with step four of his analysis and determined that Plaintiff was not able to perform his past relevant work as a maintenance mechanic (Tr. 26). At step five, the ALJ found there were jobs that Plaintiff could perform and these jobs existed in significant numbers in the national economy[2] (Tr. 26). Accordingly, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision (Tr. 27). The medical record contains substantial evidence supporting each of the ALJ's conclusions. A summary of this evidence now follows.

---

[2] The ALJ reached this determination by relying upon the testimony of the vocational expert from the prior hearing. Because there is substantial evidence in the record to conclude that Plaintiff's additional limitations had little or no effect on Plaintiff's occupational base, the Court concludes that it was proper for the ALJ to rely on that testimony.

4

From October 23, 2002 until August 25, 2005, Plaintiff was treated by the Schilsky Chiropractic Center (Tr. 222-251). At Plaintiff's first visit, on October 23, 2002, his chief complaints were back, neck, hip, arm, leg, and groin pain (Tr. 227, 230, 232). During this visit, Plaintiff completed a neck pain disability index questionnaire and rated his pain as follows: 1) his pain was the worst imaginable at the moment; 2) it is painful to look after himself and he is slow and careful; 3) he cannot lift or carry anything at all; 4) he cannot read as much as he wants because of severe pain in his neck; 5) he has headaches almost all the time; 6) he has a great deal of difficulty in concentrating when he wants to; 7) he cannot do any work at all; 8) he cannot drive his car as long as he wants because of moderate pain in my neck and he can hardly drive at all because of severe pain in his neck; 9) his sleep is greatly disturbed with three to five hours sleepless; and 10) he can hardly do any recreational activities because of pain in his neck (Tr. 231).

Plaintiff also completed a low back pain disability questionnaire where he rated his pain as follows: 1) his pain is severe and does not vary much; 2) he does not normally change his way of washing or dressing even though it causes some pain; 3) he can only lift very light weights, at the most; 4) his pain does not prevent his from walking any distance; 5) his pain prevents his from sitting more than ten minutes; 6) he cannot stand for longer than ten minutes without increasing pain and he avoids standing because it increases the pain straight away; 7) because of pain, his normal night's sleep is reduce by less than one-half; 8) he has hardly any social life because of the pain; 9) he gets extra pain while traveling which compels him to seek alternative forms of travel; and 10) his pain is rapidly worsening (Tr. 233).

On February 4, 2003, Plaintiff underwent a standing full spine examination using surface electromyography ("SEMG") (Tr. 249). Plaintiff indicated that his symptoms had not improved

5

(Tr. 225-226) and Plaintiff had a second SEMG on March 19, 2003 (Tr. 248).  On June 2, 2005, Plaintiff went back to the Schilsky Chiropractic Center complaining about headaches, pain in his spine, hips, shoulders, arm, rib, groin, as well as in his knees and feet (Tr. 222).  He was diagnosed with cervical segmental dysfunction, cervical muscle spasm, thoracic sprain/strain, thoracic segmental dysfunction, lumbar sprain/strain, lumbar segmental dysfunction, and lumbar disc syndrome (Tr. 223).  Plaintiff had a third and fourth standing full spine SEMG on June 6, 2005 and June 16, 2005, respectively (Tr. 247, 246).  Plaintiff indicated that his condition was worsening on June 30, 2005 (Tr. 250) and on August 6, 2005 Plaintiff returned because he was having severe headaches and pain in his neck, shoulder, arm, hands, back, hips, knees and feet (Tr. 224).

Beginning on November 30, 2003, Plaintiff went to the Onslow Memorial Hospital emergency room complaining of a facial droop (Tr. 124).  A CT scan of Plaintiff's head was performed and found to be normal (Tr. 123).  Plaintiff went to the Onslow Memorial Hospital emergency room on May 24, 2004 complaining of headaches, back and neck pain (Tr. 133).  The hospital performed a CT scan of Plaintiff's abdomen and pelvis, compared it to a June 20, 2003 scan, and found Plaintiff had a negative CT scan of his abdomen and pelvis, "unchanged since old study done on June 20, 2003" (Tr. 132).  Dr. Clarence Ballenger performed a spinal tap on Plaintiff on August 24, 2004 (Tr. 158).  Dr. Ballenger, on August 25, 2004, also ordered a culture and smear of his cerebrospinal fluid (Tr. 286-288).  These findings were normal (Tr. 288).

On September 3, 2004, Plaintiff returned to the Onslow Memorial Hospital emergency room for headaches (Tr. 158).  The hospital performed a CT scan of Plaintiff's head, compared it to a November 30, 2003 scan, and found no acute changes (Tr. 157).  Plaintiff went to the

Onslow Memorial Hospital emergency room on January 12, 2005 complaining of chest pain and a headache (Tr. 169). An ECG was performed which had normal findings (Tr. 172). The hospital also performed 1) an AP portable chest radiograph, compared it to an AP examination done on August 18, 2004, and found the scan to be normal (Tr. 173); and 2) a CT scan of Plaintiff's abdomen and pelvis and compared it to a May 24, 2004 scan. Although bladder distention was found, the scan was otherwise normal (Tr. 174). Dr. Issa Mahmoud examined Plaintiff on April 20, 2005 for gastroesophageal reflux (Tr. 198), performed several surgical procedures (Tr.199), and diagnosed Plaintiff with mild esophagitis, gastritis, and duodenitis (Tr. 199). Dr. Mahmoud ordered an upper GI and small bowel examination for Plaintiff on May 24, 2005 which was unremarkable (Tr. 280). An ultrasound of Plaintiff's upper right quadrant was also performed on May 24, 2005, at the request of Dr. Mahmoud (Tr. 281). The impressions were unremarkable (Tr. 280).

Dr. Mahmoud also collected a stool sample from Plaintiff on June 8, 2005 (Tr. 279), which was "negative for clostridium difficile toxins" (Tr. 279). On June 14, 2005, Plaintiff went to the Onslow Memorial Hospital emergency room complaining of diarrhea (Tr. 291). Dr. Mahmoud performed a colonoscopy and two biopsies (Tr. 293), and ordered a histology report (Tr. 294). Plaintiff was diagnosed with rectal polyps, transverse colon polyps, and diarrhea (Tr. 290). Plaintiff went back to the emergency room on August 21, 2005 for a headache and neck pain (Tr. 296). Plaintiff was discharged with medical prescriptions for his pain (Tr. 295). On January 10, 2006, Plaintiff went again to the emergency department for chest pain (Tr. 338). His treatment included rest from strenuous physical activity and ice packs for the next two to three days (Tr. 338). Plaintiff was also advised that he had abnormally high blood sugar, suspicious for diabetes (Tr. 338). He was told to stop smoking and to follow-up with his private physician

7

(Tr. 339). Plaintiff returned to the Onslow Memorial Hospital emergency room on June 17, 2006 for left flank pain (Tr. 423). The attending physician changed Plaintiff's prescriptions and told him to stop smoking (Tr. 423).

Plaintiff began having examinations at Coastal Diagnostic Imaging from March 13, 2003 until September 6, 2005. (Tr. 252-275). Plaintiff underwent 1) an examination of two views of his chest and bilateral knees on March 31, 2003 (Tr. 275); 2) a plain film evaluation of his hips on July 23, 2003 (Tr. 274); 3) a plain film evaluation of his cervical spine on July 28, 2003 (Tr. 273); 4) a second plain film evaluation of his cervical spine on December 22, 2003 (Tr. 272) along with a plain film evaluation of his lumbar spine (Tr. 271), a plain film evaluation of his hips and pelvis (Tr. 270), a plain film evaluation of his left knee (Tr. 269), and a plain film evaluation of his right knee (Tr. 268); 5) an MRI of his cervical spine on December 27, 2003 (Tr. 267); and 6) an MRI of his hips on August 26, 2004 (Tr. 266).

The Plaintiff had a third plain film evaluation of his cervical spine on September 22, 2004 (Tr. 262) along with a plain film evaluation of his thoracic spine (Tr. 263), a second plain film evaluation of his lumbar spine (Tr. 264), and a plain film evaluation of his left shoulder (Tr. 265). These examinations were generally found to be normal and without abnormality. Specifically, Plaintiff's radiological impressions showed:

> 1) moderate DDD and DJD at C6-7 causing mild to moderate bilateral neural foraminal stenosis. In addition there is a mild grade 1 degenerative retrolisthesis of C6 on C7 (Tr. 262); 2) mild DDD at C5-6 (Tr. 262); 3) mild DDD and DJD from T7-8 through T11-12 (Tr. 263); 4) mild to moderate DDD at T11-12, TI2-Ll, and Ll-2 (Tr. 264); 5) mild DDD at L3-4, L4-5, and L5-S1 (Tr. 264); 6) mild levoconvex scoliosis at the upper lumbar level (Tr. 264); 7) mild DJD at the left AC joint (Tr. 265); 8) mild to moderate DJD within both hip joints axially, which is most prominent on the left with cortical remodeling at the proximal femoral heads (Tr. 266); 9) disc osteophyte complexes at C3-4 and C6-7 causing mild to moderate bilateral neural foraminal stenosis which is most prominent on

8

the left (Tr. 267); 10) disc osteophyte complexes at C3-4 causing mild to moderate bilateral neural foraminal encroachment (Tr. 267); 11) small disc osteophyte complex at C4-5 causing mild left neural foraminal encroachment (Tr. 267); 12) mild patellofemoral DJD (Tr. 268); 13) small joint effusion (Tr. 269); 14) mild DJD within both hip joints superiorly without AVN or subchondral cyst formation (Tr. 270); 15) mild DDD at L3-4, L4-5, and L5-S1 with associated facet hypertrophy at the L5-S1 level (Tr. 271); 16) mild levoconvex thoracolumbar scoliosis (Tr. 271); 17) moderate DJD at C6-7 without acute fracture or significant subluxation (Tr. 272); 18) mild to moderate DDD at C5-6 and C6-7 with bilateral neural foraminal encroachment at these levels, which is most prominent on the left (Tr. 273); 19) mild degenerative arthropathy within both hip joints superiorly without subchondral cyst formation (Tr. 274); and 20) bilateral prepatellar soft tissue swelling identified as is a moderate size left joint effusion. There is not fracture or dislocation noted in either knee.
(Tr. 275).

On November 14, 2004, Plaintiff had an examination of both knees (Tr. 257), an AP pelvis and frogleg lateral views of both hips (Tr. 258), an examination of his thoracic spine (Tr. 259), and an examination of his cervical spine series (Tr. 260, 261). The Plaintiff had an 1) MRI of the thoracic spine on December 4, 2004 (Tr. 255); an MRI of the lumbar spine (Tr. 256), and a second MRI of the cervical spine (Tr. 254). On April 14, 2005, Plaintiff had an ultrasound of the left groin (Tr. 253). Plaintiff underwent a CT scanogram of both lower legs on September 6, 2005 (Tr. 252). Again, these examinations were generally found to be normal. Specifically, Plaintiff's radiological impressions showed:

1) the left leg is 5 mm longer than the right leg (Tr. 252); 2) no evidence of significant inguinal hernia at the left groin in the region of the patient's maximum pain (Tr. 253); 3) small focal left paracentral HNP at C5-6 with posterior vertebral osteophytes primarily causing moderate left neural foraminal stenosis (Tr.254); 4) disc osteophyte complexes at C3-4 and C6-7 causing mild to moderate bilateral neural foraminal stenosis which is most prominent on the left (Tr. 254); 5) small disc osteophyte complex at C4-5 causing mild left lateral recess encroachment (Tr. 254); 6) small central diffuse disc bulges at T5-6 and T7-8 with mild facet hypertrophy causing mild lateral recess encroachment bilaterally, which is most

9

prominent on the left at the T5-6 level (Tr. 255); 7) disc osteophyte complexes at C5-6 and C6-7 causing mild to moderate bilateral neural foraminal stenosis (Tr. 255); 8) central diffuse disc bulges at L4-5 and L5-S1 with mild facet arthropathy primarily causing mild left lateral recess stenosis and 2 mm of ventral effacement of the thecal sac (Tr. 256); 9) transitional anatomy at S1 including an S1-2 disc which displays a right paracentral diffuse disc bulge causing mild to moderate right lateral recess stenosis (Tr. 256); 10) very small bony spur along the superior aspect of the right patella (Tr. 257); 11) mild degenerative bony changes noted (Tr. 259); 12) findings consistent with muscle spasm manifested by scoliotic curvature and reversal of the normal cervical lordotic curvature (Tr. 260-261); and 13) degenerative disc disease at C5-6 and C6-7.
(Tr. 260-261).

Notably, Plaintiff did not have focal HNP, significant canal stenosis, fractures, definitive spondylolysis, or dislocations (Tr. 255, 257-259, 262-265, 267-272). Nor did Plaintiff have AVN, reactive marrow edema, significant joint effusions, significant subluxation, cyst formations, or evidence of acute cardiopulmonary disease (Tr. 266-268, 272, 274-275).

Plaintiff went to New Bern Medicine and Sports Rehabilitation on March 24, 2005 (Tr. 323-336). From April 4, 2005 until November 28, 2005, for a total of twelve visits, Dr. Sanjay Kumar treated Plaintiff for fibromyalgia (Tr. 323-334). Dr. Kumar found that Plaintiff had diminished range of motion in all planes of his cervical spine, almost normal range of motion in his lumbar spine with a slight decreased in forward flexion, normal range of motion in his bilateral hips and shoulder joints, intact motor strength in all major muscle groups, 2+ reflexes in his upper and lower extremities, and had intact to light touch in the upper and lower extremities from his sensory examination (Tr. 336). Most notably, Dr. Kumar only prescribed physical therapy, deep tissue massage with joint and capsular stretching and mobilization, aerobic exercise and back stretching/strengthening protocol (Tr. 336) to help ease Plaintiff's subjective pain.

On February 9, 2004, Plaintiff went to the Craven Regional Medical Center emergency room complaining of chronic dysequilibrium (Tr. 126). A physical therapy/occupational therapy flowsheet indicated that "[Plaintiff] is receiving therapy in Onslow County. [Plaintiff] was told by a different doctor to come here for [prescriptions] while he is still attending [physical therapy] at the other location. [Plaintiff has been given] his prescriptions and instructed . . . to take [the prescriptions] to his therapist" (Tr. 127). Plaintiff went back to the emergency room because he was having difficulty urinating (Tr. 175). Plaintiff underwent a CT scan of his abdomen and pelvis (Tr. 178). The radiology findings, which were based on eighty-eight images, were unremarkable and otherwise normal (Tr. 178-179, 184-185, 187-189). Plaintiff returned to the emergency room on April 12, 2005 with bilateral hand numbness and arm pain (Tr. 191, 194). X-rays of Plaintiff's 1) cervical spine (Tr. 192) and  2) cervical myelogram (Tr. 193) were performed with the following findings:

> Degenerative changes in the lower cervical spine with decrease in the C6-C7 disc space height with associated ostephytic lipping (Tr. 192); There is some minimal impingement on the anterior thecal sac at the C6-C7 level in the lateral projection.  No other significant myelographic abnormalities were identified.
> (Tr. 193).

A CT scan of Plaintiff's cervical spine was performed with the following findings:

> There is some minimal posterior osteophytic lipping and associated disc bulging at the C6-C7 disc space level with minimal impingement on the anterior thecal sac.  No other significant disc bulging or evidence for disc herniation is seen.  No cord  compression or displacement is seen.  No intrinsic cord abnormalities are identified.
> (Tr. 195).

On July 16, 2005, Plaintiff returned to the Craven Regional Medical Center complaining of pain all over, nausea and vomiting (Tr. 215).  Dr. Stephen Schwab evaluated Plaintiff and

discharged Plaintiff the same day (Tr. 213-221). Upon Plaintiff's discharge, Plaintiff began to

escalate his agitation (Tr. 214). As a result of Plaintiff's behavior, Dr. Schwab contacted Neuse

Mental Health consultant Lynn Durham for a psychiatric evaluation of Plaintiff (Tr. 214). Ms.

Durham made the following findings:

> the [Plaintiff] was indeed frustrated and somewhat agitated, but mostly its
> appears to be surrounding his medical issues and the difficulty and
> inability for multiple provides to provide him with an acceptable
> explanation for his complaints . . . no evidence of any acute psychosis,
> suicidal issues, or endangerment to the [Plaintiff] or community.
> (Tr. 214).

Plaintiff began receiving psychiatric therapy at the North Carolina Division of Mental

Health, Developmental Disability and Substance Abuse Service on April 27, 2005 (Tr. 201). His

goals were to reduce his pain using anger management, stress reduction strategies and relaxation

techniques (Tr. 204). He did not return for his next appointment scheduled for June 17, 2005

because "he [was] ill and [could not] travel" (Tr. 210). On this same date, however, Plaintiff

was seen by Dr. Craig Farmer of the North Carolina Department of Health and Human Services

Disability Determination Services (Tr. 276-278). Dr. Farmer noted in his summary and

conclusions the following:

> [Plaintiff] presents as capable of understanding, retaining and
> following instructions. His ability to sustain attention and perform
> simple repetitive tasks is adequate. His ability to relate to others
> including fellow workers and supervisors appears adequate. His
> ability to tolerate the stress and pressure associated with day to day
> work activity appears to be adequate. [Plaintiff] presents as
> capable of handling his finances in his own best interest.
> (Tr. 278).

Plaintiff underwent a psychiatric review (Tr. 297-310) and mental RFC assessment (Tr.

311- 314) on September 30, 2005. Dr. Brett Fox performed both evaluations (Tr. 297, 313).

While Dr. Fox determined that Plaintiff had a medically determined impairment (Tr. 300), the

degree of the impairment did not rise to a limitation which established the presence of a debilitating criterium (Tr. 307, 308). Further, with regard to Plaintiff's mental RFC, Dr. Fox noted the following:

> [Plaintiff] should be able to understand, remember and carry-out simple instructions. [Plaintiff] should be able to sustain concentration for a sufficient period of time. [Plaintiff] should be able to interact appropriately with co-workers and supervision. [Plaintiff] should be able to adapt to routine changes in the workplace. [Plaintiff] should be able to do simple, routine tasks within the limitations noted above. [3]
> (Tr. 313).

Ms. Jacqueline Brown evaluated Plaintiff's physical RFC on October 11, 2005. (Tr. 315-322). Ms. Brown concluded that Plaintiff has an RFC to do "medium work due to pain" (Tr. 322). In particular, Plaintiff's exertional limitations allowed Plaintiff to occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and or/walk about six hours in an eight-hour work day; sit about six hours in an eight-hour workday; and push and/or pull unlimited [weight], other than as shown for lift and/or carry (Tr. 316). These limitations were affirmed by Mr. Thomas Morton on January 19, 2006 (Tr. 340). Ms. Brown also indicated that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 317-320). These limitations were affirmed by Mr. Ben Williams on January 25, 2006 (Tr. 341).

On January 7, 2203, Plaintiff began physical therapy at the Onslow Memorial Rehabilitation Center for back and multiple joint pain (Tr. 151). During this first visit, Mr. Mark Chanaca noted that Plaintiff was "currently applying for disability" (Tr. 152). Plaintiff's goal

---

[3] Dr. Fox concluded that Plaintiff had a moderate limitation in five of the twenty categories assessed in Plaintiff's mental RFC (Tr. 311, 312). Plaintiff had no significant limitations in the other fifteen categories (Tr. 311-314).

was to receive physical therapy two to three times a week for a duration of four weeks (Tr. 154). After eight treatments, Plaintiff was discharged on February 7, 2003. Mr. Chanaca noted that "therapy has not been able to decrease subjective reports of pain" (Tr. 150). Plaintiff returned to the rehabilitation center on December 17, 2003 for left face Bell's palsy (Tr. 149).

Plaintiff was instructed to use a portable facial stimulation device (Tr. 148) and to begin speech therapy for his condition (Tr. 125, 148). On February 23, 2004, Plaintiff began physical therapy for multiple arthralgias (Tr. 142). Plaintiff enrolled in aquatic therapy (Tr. 145). Though Plaintiff had pain with all movements of joints, he had a "5/5 muscle strength for RLE and RUE . . . 4+ to 5/5 strength for LUE, and 5/5 for LLE" (Tr. 144). Plaintiff was discharged on May 11, 2004 because he failed to return for additional therapy (Tr. 140). Plaintiff went back to the rehabilitation center on July 1, 2004 for fibromyalgia (Tr. 139). Mr. Andrew Stern noted that Plaintiff had "multiple MRIs, consults with [sic] pain management, rheumatologist, neurologist without any subjective feelings of relief" (Tr. 135). On August 19, 2004, Plaintiff was discharged from physical therapy because there was no change in his functional status or current symptoms (Tr. 134).

Plaintiff began treatment at the Crystal Coast Pain Management Center on March 16, 2005 under the care of Dr. Angelo Tellis (Tr. 206-212). Plaintiff complained of severe neck pain (Tr. 206), and on March 22, 2005, Dr. Tellis diagnosed Plaintiff with 1) sacroiliitis; 2) myofascial pain syndrome; 3) lumbar disc displacement/herniation; 4) degeneration of lumbar or lumbosacral intervertebral disc; and 5) multi-level cervical degenerative disc disease (Tr. 208). Dr. Tellis administered a bilateral sacroiliac joint injection and instructed Plaintiff to return for a follow-up visit (Tr. 280). Plaintiff returned for his follow-up appointment on April 4, 2005 reporting a "flare up of pain in his back and groin" (Tr. 209). Dr. Tellis noted on April 18, 2005

14

that Plaintiff continued to indicate that since his last treatment there had been no improvement in his neck pain (Tr. 210). Dr. Tellis recommended that Plaintiff continue to see his primary care physician for management of his fibromyalgia and generalized pain (Tr. 212). No other follow-up appointments were scheduled for Plaintiff (Tr. 212).

Plaintiff went to Pitt County Memorial Hospital on November 29, 2005 complaining that he "hurt all over" and described his pain as "being 6/10 in intensity" (Tr. 366). Dr. Thurman Whitted reviewed his symptoms and gave Plaintiff a physical evaluation (Tr. 368). Dr. Whitted determined that Plaintiff suffered from 1) fibromyalgia syndrome; 2) chronic neck pain; 3) chronic low back pain; 4) multiple disc bulge of the cervical, thoracic and lumbar spines; and 5) depression (Tr. 368). Dr. Whitted advised Plaintiff to follow-up this visit in two to four weeks to measure Plaintiff's progress (Tr. 369). On December 20, 2005, Dr. Whitted wrote a prescription for a nerve conduction study (Tr. 362, 365), and instructed Plaintiff to schedule a follow-up visit after the examination (Tr. 362, 365). Plaintiff returned on January 3, 2006, and reported that his pain had intensified since his last visit (Tr. 360, 363).

The nerve study was conducted on January 25, 2006 (Tr. 346). Plaintiff went to the East Carolina University Department of Physical Medicine and Rehabilitation to be evaluated for peripheral polyneuropathy (Tr. 346-348). The results were otherwise normal with mild chronic changes found in Plaintiff's right C7 level and right S1 level (Tr. 347). However, the reviewing physician noted that there were "no acute or ongoing membrane instability" in either the C7 or S1 level (Tr. 347). Dr. Whitted saw Plaintiff on January 27, 2006 for his follow-up visit. Plaintiff indicated that there had been no changes in his pain (Tr. 356). Plaintiff stated that he had an appointment with a rheumatologist (Tr. 358). Plaintiff was encouraged to keep the appointment and to schedule a follow-up visit in one month (Tr. 359). Plaintiff was also referred

15

to Dr. Jeffrey Pierce for a trial of acupuncture (Tr. 359).

Plaintiff's final visit was on March 14, 2006. Dr. Whitted noted that Plaintiff had a "workup for back pain and deemed a nonsurgical candidate by a couple of orthopedic surgeons" (Tr. 354). Because Plaintiff had not responded to "any . . . treatments for his chronic pain, including narcotics and non narcotic therapies," Dr. Whitted noted that Plaintiff should follow-up with his primary care physician and return only "on an as-needed basis" (Tr. 354).

From July 5, 2005 until November 4, 2005, Plaintiff began receiving treatments for his subjective pain at Eastern Carolina Internal Medicine (Tr. 371-402). Plaintiff had an extensive work-up regarding his symptoms of chronic pain and headaches (Tr. 380). Plaintiff underwent views of his chest on July 12, 2004 which resulted in no active cardiopulmonary disease (Tr. 398). In a letter dated March 22, 2006, Dr. Michael Reardon noted only that Plaintiff's "daily activities and ability to work are limited" (Tr. 371). However, the record indicates that Plaintiff always seemed alert with a normal gait and able to walk without difficulty from the parking lot to the distal part of the clinic (Tr. 383). Further, during a cardiolite stress test, completed on July 14, 2005, Plaintiff "was able to walk for a total of eight and one-half minutes" (Tr. 387) and had "good exercise tolerance" (Tr. 400). Plaintiff had no significant chest pain while exercising and his cardiolite pictures were read as negative (Tr. 387).

Plaintiff underwent an abdominal ultrasound on July 21, 2005, which resulted in a normal ultrasound of his abdomen (Tr. 397). On September 29, 2005, Plaintiff has a CT scan of his paranasal sinuses which were normal (Tr. 396). An acute abdomen series was completed on November 4, 2005 (Tr. 395). The findings were summarized as follows: 1) moderate fecal materials; 2) some fluid levels are noted; and 3) no significant bowel dilatation or free air.

The record shows that Plaintiff has had numerous tests, studies, examinations, and

consults which resulted in normal findings or mild degenerative conditions. Even still, the record shows that Dr. Ibikunle Ojebuoboh ordered a chest AP and lateral on December 20, 2002. In the findings there was no acute pulmonary abnormality (Tr. 285). Dr. Ojebuoboh also ordered a CT head combination on August 28, 2003. Review of the impressions revealed a normal CT scan of the brain (Tr. 284). On December 22, 2003, Dr. Ojebuoboh ordered a radiological examination of Plaintiff's left hip, cervical spine, and right hip (Tr. 283). As to Plaintiff's left and right hips, the impressions were negative (Tr. 283). As to Plaintiff's cervical spine, the impressions showed cervical disk disease with normal alignment (Tr. 283). Dr. Ballenger, ordered an MRI head combo for Plaintiff on January 12, 2004 (Tr. 282). The results of the MRI were negative (Tr. 282).

Plaintiff began an additional series of various examinations, treatments, ancillary studies and drug therapies with negative or no findings, and little improvement in his condition (Tr. 431-449, 507-616). Specifically, Plaintiff underwent the following at the Veterans Administration Medical Center ("VAMC"): 1) an MRI of the cervical spine on January 14, 2003 which resulted in eccentric osteophyte on the left at C3, left disc protrusion with neural foraminal encroachment at C5, and mild spinal stenosis from generalized disc bulge at C6 (Tr. 614); 2) an MRI of lumbar spine on March 5, 2003 which resulted in slight generalized disc bulge at L5 without spinal stenosis, degenerative schmorl's nodes seen at two levels, and an otherwise normal study (Tr. 614); 3) an MRI of bilateral shoulders on March 05, 2003 which resulted in no evidence of tendinitis or rotator cuff tear on either side (Tr. 614); and 4) a nuclear bone scan on June 6, 2003 which resulted in an essentially normal scan (Tr. 407).

Plaintiff also had 1) a CT of the cervical spine on January 3, 2004 which resulted in mild arthritic changes of his lower cervical spine, mainly on the left side, and no substantial changes

17

from earlier studies (Tr. 407); 2) a carotid duplex study on February 10, 2004 which resulted in arteriosclerosis without significant stenosis (Tr. 407); 3) an arthritis profile and hepatitis C antibody on March 24, 2004 which all resulted in negative findings (Tr. 407); 4) an MRI of both hips on June 21, 2005 which resulted in slight DJD of the femoral heads (Tr. 406); 5) X-rays of his lumbar spine on February 2, 2006 which resulted in lumbar spondylosis, minimal mid lumbar scoliosis, and an otherwise normal study (Tr. 406); 6) X-rays of both knees on February 2, 2006 which were normal (Tr. 406); 7) a CT of Plaintiff's head on March 3, 2006 which resulted in a normal finding (Tr. 610), and a CXR, which was compared to a previous study completed on March 24, 2004, resulting in a normal chest finding and no apparent changes (Tr. 407). During a neurologic follow-up, on September 14, 2006, Dr. Fred Stowe noted the follow about Plaintiff:

> [Plaintiff] states that he is continuously in pain. He point out multiple areas of the pain. It involves his legs and his joint and across his abdomen an all over his back. Any movement and attempted exam resulted in a hyper-reaction to stimuli that was totally inappropriate for even fibromyalgia type pain patients. He continuously asks for medication and an explanation for why he in such pain. I pointed out that he had been comprehensively evaluated in this clinic in the past year with multiple tests including bone scans, MRIs, CAT scans, x-rays - none of which resulted in a diagnosis. He has multiple blood tests that are recorded in his records - none were abnormal. [Plaintiff] insisted on being referred to Orthopedics. He has been turned down for Orthopedic consultation on several occasions. He has been referred to Durham Veterans Administration Hospital Orthopedic Service but they did not feel that any consult was indicated . . . I do not think that any follow up in this clinic is indicated as [Plaintiff] has been throughly evaluated previously.
> (Tr. 586).

In November 2002, Dr. Ojebuoboh noted that Plaintiff had "normal gait and his reflex, motor and sensory findings were normal" (Tr. 21). In February 2004 Dr. Ojebuoboh, diagnosed Plaintiff with "fibromyalgia, chronic pain syndrome, Bell's palsy, carpel tunnel syndrome, back pain, chronic sinusitis, chronic fatigue and migraines (Tr. 21). Dr. Ojebuoboh indicated that these were permanent conditions (Tr. 21). Moreover, Dr. Ojebuoboh concluded that

18

> [Plaintiff] was limited in his ability to sit more than four hours, stand more than two hours and walk more than four hours in an eight-hour workday . . . [Plaintiff] was able to lift up to five pounds occasionally and perform occasional reaching . . . [Plaintiff] was unable to perform bending, squatting, crawling, or climbing . . . [Plaintiff] was unable to use his hands for repetitive action such as simple grasping, pushing and pulling with arm controls or perform fine manipulation . . . [Plaintiff] was unable to use his feet and legs for repetitive movements such as, pushing and pulling with leg or foot controls . . . [Plaintiff] was unable to travel by car more than a short distance and then, not on a daily basis.
> (Tr. 21).

However, on March 3, 2006, Dr. Geeta Katwa evaluated Plaintiff and made no findings of autoimmune disease or rheumatoid arthritis (Tr. 344). Moreover, Dr. Katwa noted that Plaintiff's "fist grip was . . . about 5x5 and very strong" (Tr. 344). Dr. Katwa advised Plaintiff "to return to the clinic only on an as needed basis" (Tr. 345). Dr. Roderic Carney noted in June, 2003 that "he suspected the [Plaintiff] of malingering since his examination findings were essentially normal . . . [Plaintiff] had numerous referrals to specialists without any significant abnormal findings" (Tr. 21). In a letter, dated May 25, 2005, Dr. Jose Ros of Coastal Carolina Internal Medicine withdrew providing medical care for Plaintiff (Tr. 289). And on December 6, 2007, Dr. Peter Chung noted that VAMC "had no further interventions to offer" (Tr. 461, 498) and

> [in his] opinion that given the patients's multiple problems, his ability to engage in productive work would be limited. [Plaintiff] will probably not be able to lift weight greater than 20 [pounds] and not be able to stand or sit for prolonged periods; it is unlikely he will be able to walk far distances.
> (Tr. 460-461, 497- 498).

With regard to the Plaintiff's credibility, the ALJ made the following observations:

> After considering the evidence of record, the undersigned finds that the [Plaintiff's] medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting

> effects of these symptoms are not entirely credible . . . [Plaintiff's] allegations of total disability are contradicted by the evidence of record, which reveals that his allegations are exaggerated and out of proportion to his treatment history and the findings of his evaluations, examinations, and studies . . . [Plaintiff's] allegations of functional restrictions are not fully credible.
> (Tr. 25- 26).

Further, by Plaintiff's own testimony, Plaintiff is able to wake his children and get them ready for school (Tr. 640), meet with friends and go to the drag strip (Tr. 18, 641), as well as drive to the grocery store or take his children to school when they miss their bus (Tr. 643). "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ's findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility.

Each of the treating physicians indicated that Plaintiff suffers for some form of chronic pain; but, generally in the absence of an inflammatory condition (Tr. 22-24). None of the physicians give a definitive assessment of Plaintiff's limitations or whether Plaintiff's conditions are debilitating. This conclusion is supported by the overwhelming numbers of normal or mild findings resulting from multiple studies and evaluations. Although Drs. Ojebuoboh, Chung and Reardon provided some assessment of Plaintiff's limitations, the ALJ concluded that these opinions were inconsistent with Plaintiff's medical record (Tr. 26).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's memorandum in support of his

claim is only four pages in length and lists only one specific assignment of error. The limited argument forwarded by Plaintiff essentially contends that the ALJ improperly weighed the evidence before him. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claim is meritless. Nonetheless, the undersigned will address Plaintiff's sole assignment of error.

## Assignment of Error

Plaintiff asserts that the ALJ erred in not finding the treating physician opinions were supported by substantial evidence. Specifically, Plaintiff contends that the ALJ inappropriately disregarded the opinions of Drs. Ojebuoboh and Chung. This argument is meritless.

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245 (Slip Op. at 8) (W.D. Va. 2006) (internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . . an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." Id. (internal citations omitted). While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)

Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4th Cir. 1999) (unpublished opinion) (internal citations omitted). In the instant matter, the ALJ found:

> As for the opinion evidence, the undersigned agrees with the assessments of the medical consultants with respect to physical limitations as they are consistent with the evidence of record and not contradicted by the evidence of record received at the hearing level. Thus, the State agency consultants' opinion received considerable weight in deciding this case. However, the undersigned finds the opinion of Dr. Ojebuoboh . . . [is] not persuasive and not supported by the medical evidence of record, including [his] own treatment records and have not been given determinative weight . . . The undersigned concurs with the statement by Dr. Chung, as it is consistent with the other medical evidence of record in this case.
> (Tr. 26).

In his order, the ALJ explained his reasons for giving Dr. Ojebuoboh's opinion less than controlling weight. The ALJ stated that Dr. Ojebuoboh's opinion was not well supported by the record and was inconsistent with other medical evidence (Tr. 26). Moreover, there is substantial evidence to support the opinions of the state agency consultants. Thus, it was proper for the ALJ to give the state agency consultants considerable weight in this matter. With regard to the

opinion of Dr. Chung, the ALJ agreed with Dr. Chung's statement as it is consistent with medical evidence in the record. These determinations by the ALJ are supported by substantial evidence and, therefore, this assignment of error is without merit.

### Conclusion

For the aforementioned reasons, it is **HEREBY RECOMMENDED** that Plaintiff's Motion for Judgment on the Pleadings **[DE-17]** be **DENIED**, Defendant's Motion for Judgment on the Pleadings **[DE-21]** be **GRANTED**, and the final decision by Defendant be **AFFIRMED**.

**SO RECOMMENDED** in Chambers at Raleigh, North Carolina this 22nd day of September, 2009.

_____
William A. Webb
U.S. Magistrate Judge

23